**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 20-cr-00061(APM)** |
| v. | **Case No. 20-cr-00102 (APM)** |
| **CRAVEN CASPER,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in the two above-captioned criminal matters. The defendant, Craven Casper, is charged in two pending criminal matters that the Court consolidated for sentencing, which is scheduled for October 22, 2020, at 11:00 a.m. As set forth below, Casper is a serial fraudster who thrives on committing a wide variety of thefts. Indeed, lying and stealing have been a major part of his life, if not a compulsion, as evidenced by Casper's extensive criminal history, his commission of the instant offenses while on probation, and his troubling post-plea conduct while awaiting his upcoming sentencing. In short, Casper provides a textbook example of the dangers of under-deterrence. The state courts' slap-on-the-wrist approach to addressing Casper's previous crimes did not work. Rather, it emboldened him to continue and indeed escalate his criminal conduct and in turn failed to protect the public from Casper's continuing harm.

Accordingly, and for the reasons set forth below, the Court should sentence Casper to a period of incarceration of 41 months. This is at the high end of his revised Guidelines range of 33-41 months, as calculated by the government below, and it approaches the Guidelines range of 46-57 months, as calculated by U.S. Probation. Alternatively, if the Court calculates a different

1

Guidelines range, it should sentence Casper at the high end of that range. The Court should further order a period of supervised release of three years and order Casper to pay restitution in the amount of $235,807.11 ($232,006.66 from the first prosecution plus $3,800.45 from the second). The recommended 41-month sentence is needed to protect the public from an inveterate and out-of-control fraudster and send a long-overdue message to Casper and to other would-be fraudsters that such conduct will not be tolerated.

## FACTUAL BACKGROUND

### I. United States v. Craven Casper, 20-cr-00061 (APM)

In 2019 the District of Columbia Office of Tax and Revenue ("DC-OTR") and the United States Postal Inspection Service ("USPIS") discovered that Casper filed hundreds of online fraudulent tax returns to various state taxing authorities around the country, using other peoples' names and personal identifying information to obtain fraudulent tax refunds. Many of those states issued tax refund checks to Casper, and Casper deposited those checks in various bank accounts he opened, often in victims' names. To facilitate his fraud, Casper also opened various Post Office boxes in the District of Columbia to receive the refund checks. From February 2019 to July 2019, Casper successfully received and negotiated approximately 50 refund checks from various states, totaling over $197,000.[1]  *See* Statement of Offense at ¶ 2(f), ECF No. 5.

DC-OTR and USPIS also discovered that Casper submitted numerous online fraudulent claims for payments from various class action settlement funds pending from litigation in both

---

[1] This figure may be less than what Casper actually received, since the Government may not have identified all of the bank accounts controlled by Casper into which he deposited fraudulent tax refund checks. Because Casper often opened bank accounts in victims' names, identifying the universe of his bank accounts has posed significant challenges.

2

state and federal courts around the country. Specifically, the evidence revealed that Casper identified various class action settlement funds administered throughout the country and submitted false claims for money from those funds, using other peoples' names and personal identifying information. Casper then received class action settlement checks at various Post Office boxes he maintained, and he deposited them into various bank accounts that he had opened, often in victims' names. DC-OTR and USPIS determined that Casper received over $34,487.84 from this scheme.[2] *See* Statement of Offense at ¶ 2(j), ECF No. 5.

Based on this criminal conduct, the United States Attorney's Office for the District of Columbia served a target letter on Casper in October 2019. The letter informed Casper of the pending criminal investigation and provided him the opportunity to meet with the office for an interview. That month, Casper met with the office and confessed to his crimes. At the conclusion of the interview, the government warned Casper not to commit any further criminal conduct while the parties negotiated the terms of a plea agreement. On March 12, 2020, Casper appeared before this Court and pled guilty to a one-count Information charging him with Mail Fraud, in violation of 18 U.S.C. § 1341. *See* Plea Agreement and Statement of Offense, ECF No's. 4, 5. This Court scheduled Casper's sentencing hearing for June 23, 2020.

Of note, Casper committed all of the tax refund and class action settlement fraud while being supervised in *at least one other criminal fraud case* in Carteret County, North Carolina. *See* Pretrial Services Report, ECF No. 3; Final Presentence Report ("PSR") at ¶ 60. Specifically, Casper was convicted in North Carolina in 2016 of *multiple* fraud-related felonies – for "Identity

---

[2] Again, this figure may be lower than what Casper actually received, since the Government may not have identified all of Casper's bank accounts.

Fraud/Theft," and "Obtaining Signature False Pretense," as well as a series of theft-related felonies involving two separate instances of stealing and re-selling or attempting to re-sell over $40,000 collectively of restaurant equipment. PSR ¶¶ 60-71. The Carteret County Court ultimately consolidated several of those matters into consecutive judgments. *See* PSR ¶ 60, 71. According to the court records obtained by the PSR writer, Casper appeared before the Court in Carteret County for a three-year review hearing in connection with 16CR1344, and the Court terminated his supervision early, on or about November 22, 2019. PSR ¶ 71.[3]

## II.  United States v. Craven Casper, 20-cr-00102 (APM)

Despite having been convicted in North Carolina and this Court for committing fraud, Casper remained undeterred in his criminal ways. In early March 2020, shortly before Casper's March 12, 2020, plea hearing in 20-cr-00061, USPIS discovered the website, "www.coronavirusprotectionmasks.org," being operated by Casper. On that website, Casper offered various coronavirus-related personal protection equipment ("PPE") products for sale, such as N95 respirator masks, an "Emergency Pandemic Prep Kit" (consisting of one Tyvek coverall suit, respirator masks, latex gloves, and hand sanitizer), and Purell hand sanitizer. The website also solicited donations to the Global Coronavirus Relief Fund, claiming that donations would be used to support hospitals affected by the COVID-19 outbreak. Records later obtained from the company hosting the website show that Casper created the website on February 24, 2020.

---

[3] According to media reports, Casper's convictions stem from: (1) a scheme where he worked as a real estate broker and stole kitchen equipment from a client's restaurant, which he subsequently sold; and (2) a credit card fraudulently set up by Casper using a family member's name. *See* "Casper faces new charges, higher bond," Carteret County News-Times, *available at* https://www.carolinacoastonline.com/news_times/article_52bd2aae-2e65-11e6-8c12-13d75661ef88.html (last checked April 1, 2020). This was confirmed by the PSR writer. *See* PSR ¶¶ 60-71.

4

Following Casper's plea hearing in his pending matter before Judge Mehta, a USPIS postal inspector attempted to purchase PPE from the website. The website's payment processing service, however, was no longer accepting any payments from the site. Records obtained from Stripe Inc., the online payment processing service utilized by Casper for the website, revealed that over 140 transactions for customer purchases occurred through the website between February 27, 2020, and March 12, 2020 (the date of Casper's guilty plea before Judge Mehta). At least 24 of those customers filed disputes with their credit card providers. The records obtained from Stripe also showed that Casper had at least $8,938.74 in transactions on his website over the near two-week period, and he transferred $7,958.19 to an outside bank account at Coastal Community Bank. *See* Stripe Records, Exhibit B.

Law enforcement contacted some of the customers, and each of them confirmed that they attempted to purchase coronavirus-related supplies on Casper's website, which they never received. The customers explained that they received an email from Casper's website stating that their order was submitted, and a second email stating that their items shipped. When some of the customers attempted to contact Casper through the email account associated with the website, the customers received a message stating the account was no longer operational. Furthermore, none of the customers ever received a refund from Casper's website.[4] In all, the government identified that Casper stole at least $3,800.45 of the money submitted by customers to purchase PPE through his website. *See* Statement of Offense at ¶ 2(h), ECF No. 23.

---

[4] Law enforcement also found at least five Twitter accounts controlled by Casper which advertised his website, coronavirusprotectionmasks.org. Various Twitter users, who apparently attempted to purchase items from Casper's website, complained on Casper's Twitter accounts that the website was fraudulent.

Moreover, records obtained from Coastal Community Bank, which received the funds from the PPE website's customers, showed that Casper used a false name to create his bank account (Craven *John* Casper rather than his true name, is Craven *Randall* Casper). *See* Bank Records, Exhibits A and C. Casper also provided a new email address to Coastal Community Bank – johncasper1953@yahoo.com.

### III.   Casper's Post-Plea Conduct While on Release in 20-CR-00061

After pleading guilty on March, 12, 2020, while Casper was on release in the above-captioned tax refund/class action settlement fraud matter, he spent stolen victim funds, traveled to North Carolina without permission, and continued to engage in additional fraudulent activities. The Coastal Community Bank records showed that, between March 12, 2020, and April 1, 2020, Casper withdrew sums of money without providing any refunds to the customers who failed to receive products through his website. For example, the records show that Casper withdrew $443.00 on March 16, 2020, and $503.00 on March 14, 2020 (these were likely withdrawals for $440.00 and $500.00, with an additional $3.00 ATM service fee included). *See* Exhibit A. Casper also spent money at Target, CVS, and restaurants in Chapel Hill, North Carolina, from March 12, 2020, to March 16, 2020. *Id.* Indeed, on the day that Casper pled guilty (March 12, 2020), his bank account held $1,779.62. *Id.* As of today, that bank account is nearly zero, meaning that Casper continued to spend down, rather than refund, his victims' money while on release in this case. *See* Exhibit C (showing a balance of near zero in his bank account).

The records from Coastal Community Bank also revealed that Casper was spending money at various establishments in North Carolina while he was on pretrial release in his pending case, even though his pretrial conditions prohibited him from traveling outside of the District of

6

Columbia without prior permission of the Court. For instance, the records revealed that Casper charged his account at a Chick-Fil-A restaurant in Durham, North Carolina, on March 16, 2020, and made other charges in North Carolina around that time. *See* Exhibit A. At no time did Casper ever seek permission from Pretrial Services or this Court to travel outside of the District of Columbia in his pending case. Moreover, the bank records also showed that, on March 2, 2020, Casper cashed a check in the amount of $2,120.00 from the Treasurer of the State of Missouri. This check is most likely one that Casper received as part of his tax refund scam to which, ten days after cashing this check, he pled guilty.

On the day of Casper's arrest (April 3, 2020), law enforcement agents executed a search of his apartment and found boxes containing N95 masks. The government, however, found no evidence that Casper ever fulfilled any of the orders submitted through his website. The agents also found a boarding pass in Casper's name for a flight from Raleigh, North Carolina, dated March 16, 2020, which confirms that Casper traveled from the District of Columbia in violation of his conditions of release in his other pending matter. *See* Boarding Pass, Exhibit G.

Moreover, during the execution of the search warrant on the day of Casper's arrest, law enforcement agents found evidence indicating that Casper continued to engage in additional fraudulent activity.

### i. **Fraudulent Claim for West Virginia Unemployment Benefits**

During the execution of the search warrant on April 3, 2020, agents recovered documents showing that Casper filed for unemployment benefits with the State of West Virginia. *See* West Virginia Unemployment Benefits Records, Exhibit D. The documents showed that Casper *filed* for the benefits on *March 31, 2020*, at 12:07 pm. *Id*. p.3. He received Confirmation Code

7

N852714.[5]  Casper provided a false address of 30 Iberian Ct, Martinsville, West Virginia, 25405. *Id*.  Casper also provided his email address and his phone number as part of the application. According to Casper's application for benefits, he claimed to have worked at Payless ShoeSource from January 21, 2018, to March 21, 2020.  *Id*. p. 4.  This, of course, contradicts Casper's statements to Pretrial Services, where he informed his Pretrial Services representative that he was unemployed.  Casper, at all relevant times, lived in the District of Columbia and never resided in Martinsville, West Virginia.  Furthermore, law enforcement found that Casper often used the purported employer, "Payless ShoeSource," on many of the false state tax returns he filed as part of the fraudulent tax refund scheme.[6]  USPIS agents also confirmed that the application for unemployment benefits was actually submitted online with Workforce West Virginia on March 31, 2020.  Therefore it appears that Casper attempted to commit the crimes of theft and fraud while pending sentencing in his first case before this Court (20-cr-00061).

### ii. Attempted Theft from United States Postal Service

During the execution of the search warrant on April 3, 2020, agents also seized documents showing that Casper submitted a claim, also on or about *March 31, 2020*, the same day he submitted the bogus unemployment insurance claim to West Virginia, this time to the United States Postal Service ("USPS") for a missing package associated with his coronavirus fraud scheme.  *See* Postal Claim Documents, Exhibit E.  Specifically, agents found a completed USPS domestic claim for a lost/missing package, which Casper signed and dated on March 31, 2020.  *See id*. p.

---

[5] Casper also gave the State of West Virginia a false name, referring to himself as "Craven R. Caspee."

[6] Casper likely used Payless ShoeSource because the company is currently in Chapter 11 bankruptcy, and therefore it would be more difficult to confirm his employment there.

1-4. The form stated that Craven purchased N95 supplies for a dealer in Coppell, Texas, for $361.91 and which Casper claimed had a value of $1,104.00. *See* p. 2. Casper provided the tracking number for the package in his claim form, and he claimed that he did not receive the package at all. *See id*. Agents also found a print-out from eBay for a seller of N95 masks in Coppell, Texas, in Casper's apartment. *Id.* p. 6. In addition, agents found documents indicating that Casper submitted the claim to USPS by mail. *Id.* p. 1, 10.

Notably, agents found the package in Casper's apartment that he claimed was missing. *See* Photograph of "Missing" Box, Exhibit F. That package had the same tracking number as submitted by Casper on the missing package form to USPS (note the last nine digits of the tracking number on the label match the last nine digits on the USPS claim form). Therefore, it appears that Casper sought to steal from USPS by submitting a false claim that his package was never delivered, when in fact it was delivered and sitting in plain view in his apartment. Therefore it appears that Casper attempted to commit theft of government funds, in violation of 18 U.S.C. § 641, while on release.

**THE PSR WRITER'S GUIDELINES CALCULATIONS AND PLEA AGREEMENTS**

According to the Final Presentence Investigation Report ("PSR"), U.S. Probation calculated Casper's Guidelines as follows:

| | |
|---|---|
| Base offense level (USSG §2B1.1(a)(1)) | 7 |
| Loss amount of $235k ($150k-$250k) (§2B1.1(b)(1)(G)) | 10 |
| 10 or more victims (USSG §2B1.1(b)(2)(A)(i)) | 2 |
| 5 or more means of identification (USSG §2B1.1(b)(11)) | 2 |
| No acceptance of responsibility (USSG §3E1.1) | <u>0</u> |
| Total adjusted offense level: | 21 |

*See* PSR at ¶¶ 48-58.

In its calculations, Probation determined that Casper is not eligible for a three-level reduction for acceptance of responsibility under USSG §3E1.1, reasoning that he committed the COVID-related fraud while out on bond for the tax refund and class action settlement fraud schemes. PSR at ¶¶ 43, 57. It calculated Casper's criminal history as a category III. PSR at ¶ 76. Accordingly, Probation calculated Casper's total adjusted offense level at 21 and his recommended guidelines range at 46-57 months. PSR at ¶ 122. In its recommendation, Probation recommended an upward variance to 60 months' in custody. *See* U.S. Probation's Sentencing Recommendation, pp. 1-3, Dkt. 33.

In the March 12, 2020, plea agreement, which drives Casper's sentence, the parties set forth Casper's estimated total offense level of 21, with a three-level adjustment for acceptance pursuant to USSG §3E1.1, which ultimately calculated Casper's estimated total adjusted offense level of "at least 18." *See* March 12, 2020 Plea Agreement (Case No. 20-cr-00061) at Para. 4A, p. 2-3. *See also* July 7, 2020, Plea Agreement (Case No. 20-cr-00120) at Para. 4A, pp. 2-3. The parties also set forth Casper's estimated criminal history category at a Criminal History Category ("CHC") II. Accordingly, Casper's estimated Guidelines range set forth in the plea agreement was 30-37 months. See March 12, 2020 Plea Agreement (Case No. 20-cr-00061) at Para. 4C, p. 3.

**Acceptance of Responsibility**

As set forth in the discussion of the § 3553 factors below, Casper's brazen conduct after the entry of his plea on March 12 is quite troubling and provides further evidence that a substantial sentence is needed to incapacitate him, protect the public, and deter him from future crime. Nevertheless, the government, per its written plea agreements, recommends that he receive three levels off for acceptance of responsibility under USSG §3E1.1.

10

**Criminal History**

As set forth in the PSR, the pre-sentence investigation revealed that Casper has an extensive criminal history in North Carolina. The PSR contains a detailed analysis of Casper's criminal history points, the defendant's objections, and Probation's responses. In each instance, the government agrees with Probation's calculation of Casper's CHC. As the PSR sets forth, Casper has at least 14 separate docket entries in Carteret County Court, each of which resulted in convictions, mostly for fraud and fraud-related conduct. Although the North Carolina Court sentenced Casper on the same day (September 8, 2016), it is clear from the court records that in multiple instances Casper had been arrested on separate occasions for criminal conduct that occurred on separate dates, involved distinct victims, and had been charged in separate instruments.

Probation's calculation of Casper's four criminal history points (one for case number 15CRS051307, one for 16CR01352, one for 16CR1344, one for 16CR055368) is supported by the Carteret County court records. As discussed in the PSR, Casper's conviction in connection with case 15CRS051307 relates to Casper's arrest on April 16, 2015, and later conviction for, among other things, felony larceny involving $22,000 worth of restaurant equipment on January 23, 2015. Casper's conviction in connection with case 16CR01352 relates to Casper's arrest on May 7, 2015, and later conviction for, among other things, obtaining property by false pretenses when he subsequently sold the stolen equipment for $2,000 on January 26, 2015. Pursuant to U.S.S.G. § 4A1.2(a)(2), because of the different arrest dates, each conviction gives rise to a separate criminal history point. The fact that Casper was sentenced on the same date is of no moment. By contrast, U.S.S.G. § 4A1.2(a)(2) provides that had there been "no intervening arrest date, prior sentences

11

are counted separately unless . . . (B) the sentences were imposed on the same day." Likewise, the fact that Casper's convictions were consolidated into consecutive judgments does not alter the fact that each is treated as a prior sentence.

Casper's conviction in connection with case 16CR1344 relates to Casper's arrest on May 30, 2016, and later conviction for identity theft that occurred on May 30, 2016. Again, pursuant to U.S.S.G. § 4A1.2(A)(2), because of the different arrest dates, this conviction gives rise to a third criminal history point. The court records confirm that Casper's conviction in this case was not consolidated with 15CRS051307.

As set forth in the PSR, Casper's fourth criminal history point stems from his conviction in connection with case 16CR055368, which relates to Casper's arrest on November 8, 2016, and later conviction, for cyberstalking. Court records make clear that Casper pled guilty to the charge on August 30, 2017. At the time of his plea, the Court indicated that it would postpone sentencing and dismiss the charge if Casper complied with certain terms of supervision. The court eventually dismissed the charge on December 19, 2017. Contrary to Casper's objection, this eventual dismissal does not impact his criminal history calculation. Pursuant to U.S.S.G. § 4A1.2(f), "a diversionary disposition resulting from a finding or admission of guilt . . . in a judicial proceeding is counted as a sentence under § 4A1.1(c), even if a conviction is not formally entered."

Court records also confirm that Casper was properly awarded an additional two points under U.S.S.G. § 4A1.1(d) because he committed the instant offense while he was "under any criminal justice sentence, including probation . . . . ." U.S.S.G. § 4A1.1(d). *See* PSR ¶ 71. Here, Casper successfully obtained an early termination of his probation in connection with 16CR1344 on November 22, 2019. As set forth above and in Casper's statement of offense, he committed

12

the mail fraud tax refund theft scheme from February 2019 to July 2019, while still on probation. PSR ¶ 24. *See* Statement of Offense at ¶ 2(f), ECF No. 5.

Accordingly, the government agrees with Probation's calculation of his criminal history score is 6 and, per the Sentencing Table Part A, his CHC is III. PSR ¶ 76. Notably, the plea agreements specifically contemplated possible future revisions of Casper's CHC. The agreements noted that the CHC was merely an "estimate," "based upon the information now available," and provided that "after the pre-sentence investigation . . . a different conclusion . . . may be reached and your client's criminal history points may increase or decrease." *See* March 12, 2020 Plea Agreement (Case No. 20-cr-00061) at Para. 4B and July 7, 2020 Plea Agreement (Case No. 20-cr-00120) at Para. 4B. The plea agreements also specifically provided in Paragraph 4C that "the parties are free to argue for a Criminal History Category different from that estimated above . . . ." In addition, the plea agreements both specifically stated, "[i]n the event that the Court or the presentence report writer considers any Sentencing Guidelines adjustments, departures, or calculations different from those agreed to and/or estimated in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in 18 U.S.C. § 3553(a), the parties reserve the right to answer any related inquiries from the Court or the presentence report writer and to allocute for a sentence within the Guidelines range, as ultimately determined by the Court, even if the Guidelines range ultimately determined by the Court is different from the Estimated Guidelines Range calculated herein."

## **THE FACTORS UNDER 18 U.S.C. § 3553 SUPPORT A 41-MONTH SENTENCE**

After calculating the applicable Guidelines range, the Court should next consider all of

the applicable factors set forth in 18 U.S.C. § 3553(a).[7]

### 1. Nature and Circumstances of the Offense and its Seriousness

Casper engaged in a calculated scheme to steal money from various states by submitting false and fraudulent tax returns in order to obtain tax refund checks. This scheme was complex, as Casper obtained individuals' personal identifying information from various online resources, submitted fraudulent tax returns to a variety of states, and then had to open Post Office boxes to receive those checks. Once Casper obtained the checks, he had to then cash them, often using a variety of bank accounts that he opened in victims' names. Moreover Casper stole a considerable amount of money. In only six months, he successfully stole over $197,000 through this scheme, and possibly more.

While Casper was engaging in that tax refund scheme, he was operating a similar scheme where he submitted false claims for class action settlement checks. To accomplish these thefts, Casper submitted the claims in other peoples' names, engaging in the same type of identity theft that he engaged in regarding the tax refund scheme. Casper stole approximately $34,000 through that scheme.

These significant financial losses, totaling just under $250,000, still understate the harm

---

[7] Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the offense as set forth in Guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

Casper inflicted on his victims when he stole and successfully misused the means of identification of at least 167 individuals. For those innocent individuals, many will have to try to clear their names with federal and state taxing authorities and/or claims administrators and otherwise expend resources to "claw back" their stolen and misappropriated identities.[8]

Casper's criminal conduct was multi-faceted, widespread, and ruthless. While Casper was directly engaged in negotiating his plea agreement, he began yet another fraud scheme, this one tied directly to the COVID-19 pandemic. While Casper may have provided the PPE to his customers at the beginning of the scheme, he eventually decided to steal his customers' money instead. Casper's COVID-related fraud scheme, although smaller in size, was particularly pernicious. For his own financial gain, Casper exploited the pandemic and preyed upon people who were desperate to protect themselves and their families from danger. He did so during the early stages of the pandemic, when PPE supplies were especially scarce and people were even more vulnerable to exploitation. Furthermore, Casper continued to spend down the money he stole in his PPE scheme while on release in his original tax refund/class action settlement fraud matter. From February 27 through his March 12 change of plea hearing, Casper engaged in 140 PPE transactions and took in over $8,000. After formally pleading guilty on March 12, Casper chose to dissipate the money he stole from victims rather than to pay victims' pending refund

---

[8] As a consequence of Casper's scheme, a taxpayer victim will be at a much higher risk of being audited and/or fined by the IRS. In a hypothetical example, if Casper submitted a bogus tax refund request for $3,000 in the name of Virginia resident Victim A to the state of Maryland for 2018, Maryland would then issue a $3,000 check in Victim A's name, which would be sent to Casper. Then in the 2019 tax year, Maryland tax authorities would mail a 1099G showing the $3,000 in income to taxpayer Victim A. That 1099G would also be transmitted to the IRS, which in turn would erroneously show additional income associated with Victim A's social security number. So when Victim A then filed her tax return in 2019, there would be a discrepancy that could expose her to an audit and/or fine by the IRS.

requests. Perhaps most troubling, on March 31, 2020, Casper was expanding into additional criminal ventures, this time posing as Craven "Caspee" and filing a fraudulent application for West Virginia unemployment benefits.

Casper's criminal conduct, which involved identity theft, online fraud, opening bank accounts, cashing checks, and spending down ill-gotten profits – some of which was committed while Casper knew he was on release –is serious and warrants the recommended 41-month sentence, or a sentence at the high end of any alternative Guidelines range as calculated by the Court.

A high-end Guidelines sentence is particularly appropriate here because Casper received significant benefits from his plea agreements. Notably, Casper avoided being charged with committing aggravated identity theft in violation of 18 U.S.C. §1028A, which has a two-year mandatory minimum sentence, to be imposed consecutively.

**2. The History and Characteristics of the Defendant**

Casper, although eminently employable, instead became a brazen, seasoned fraudster. He is a 38-year-old male who, by all accounts, is well educated and capable of earning money through honest means. According to Casper, he holds an undergraduate of the University of North Carolina at Chapel Hill and a Masters in Business Administration from Johns Hopkins University. Yet despite garnering these credentials, Casper chose to eschew legitimate employment and instead to steal money and identities through fraudulent means – as shown in his numerous felony convictions from Carteret County, North Carolina, his two federal felony convictions in this Court, and the other uncharged criminal conduct discovered by the government while executing the search warrant in the most recent matter. Again and again, rather than make an honest living,

Casper has opted to lie to and steal from others. His extensive criminal history, his commission of the instant offenses while on probation, his disturbing post-plea criminal conduct, and his callous exploitation of a global pandemic all support a 41-month sentence.

### 3. The Need to Protect the Public and to Deter Casper and Others

Casper provides a textbook example of the dangers of under-deterrence. Despite numerous earlier convictions, and indeed even while on release, Casper relentlessly continued to devise and pursue new fraudulent schemes – effectively scoffing at the absence of serious consequences from earlier prosecutions. A below-guidelines sentence, like the state courts' previous approach, will continue to send the message to Casper that his criminal conduct is not serious. This will once again embolden him and encourage him, and others like him, to continue and even escalate his criminal conduct and in turn to hurt more people. As the PSR writer noted in its recommendation for an upward variance to 60 months, Casper has shown that he has no intention of refraining from criminal conduct, and, as a result, incapacitation is needed to protect the public and deter Casper.

Therefore, this factor favors a sentence at the high end of the Guidelines range.

### 4. The Kinds of Sentences Available Support a Within-Guidelines Range

The maximum term of imprisonment for Wire Fraud is 20 years with a term of supervised release of not more than three years. Because the applicable Guidelines range is in Zone D of the Sentencing Table, the defendant is not eligible for probation under the Guidelines. U.S.S.G. § 5B1.1, commentary.

### 5. The Need to Avoid Unwarranted Sentence Disparities

A Guidelines-compliant sentence of 41 months would be in-line with not just the

17

appropriate sentence contemplated under the Sentencing Commission's Guidelines framework but also other sentences issued in similar cases, thereby avoiding unwarranted sentencing disparities. For example, in *United States v. Mikolai Mardakhayeu*, 10-cr-010196 (GAO) (D. Mass. 2011), the defendant was sentenced on June 22, 2011, in the District of Massachusetts to 41 months in custody, having pleaded guilty to wire fraud and wire fraud conspiracy in connection with his operating a tax refund fraud scheme. The defendant, who had *no criminal history*, received approximately $230,000 in stolen refunds. His guidelines range was 41-51 months, and the government had recommended a 41-month sentence.

### 6. The Need to Provide Restitution

Casper stole over $230,000 from taxing authorities, settlement claims administrators, and consumers. As part of the Court's sentence, the Court should require Casper to pay restitution in the amount of $235,807.11, per the terms of the parties' plea agreements.

### CONCLUSION

Casper, who has an extensive criminal history, engaged in complex schemes through which he stole over $230,000 from taxing authorities, claims administrators, and consumers. Accordingly, the government is requesting a sentence of imprisonment of 41 months, at the high end of the Guidelines range of 33-41 months. The Court should also order the defendant to pay the agreed-upon amount of $235,807.11 in restitution.

Respectfully submitted,

MICHAEL R. SHERWIN
ACTING UNITED STATES ATTORNEY

BY:         */s/   Mona Sedky*
        Mona Sedky
        Special Assistant United States Attorney
        D.C. Bar. Bar 447968
        555 4th Street, N.W., Rm. 4842
        Washington, D.C. 20530
        (202) 262-7122; Mona.Sedky2@usdoj.gov

Certificate of Service

I hereby certify that the GOVERNMENT'S SENTENCING MEMORANDUM and attachments were duly served upon the defense counsel Michelle Peterson, FPD, by electronic means via the Court's ECF system.

This 16th day of October, 2020.

                                                                           /s/   Mona Sedky
                                                        Mona Sedky
Special Assistant United States Attorney
D.C. Bar. Bar 447968
555 4th Street, N.W., Rm. 4842
Washington, D.C. 20530
(202) 262-7122; Mona.Sedky2@usdoj.gov